IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Guy Lucas, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 25 C 4635 |
| | ) | |
| | ) | |
| Soo Line Railroad Company | ) | |
| d/b/a Canadian Pacific, | ) | |
| | ) | |
| Defendant. | ) | |

Memorandum Opinion and Order

Plaintiff Guy Lucas worked for defendant Soo Line Railroad Company, doing business as Canadian Pacific ("Soo Line"), from 2009 until his termination in 2023. Lucas believed that Soo Line fired him because his tendency to file train-slowing safety reports had made him a troublesome employee. He sued Soo Line, alleging retaliation in violation of the Federal Railroad Safety Act. Before me is Soo Line's motion for summary judgment. I deny that motion.

1

**I.**

The following facts are not in dispute except where noted.[1]

Soo Line operates railroads and is subject to the Federal Railroad

---

[1] In the Northern District of Illinois, motions for summary judgment are subject to Local Rule 56.1. This rule requires that the moving party submit a "statement of material facts," to which the opposing party can respond; it then allows the opposing party to submit his own "statement of additional material facts" to which the moving party can respond. L.R. 56.1(a)-(c). Where a party introduces new facts in a Rule 56.1 response, he is supposed to attach documents which support those new facts. The purpose of L.R. 56.1 is to provide me with a roadmap to the record in general and the disputed facts in particular. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994).

Despite that purpose, L.R. 56.1 filings often create their own trouble. Here, Soo Line has argued that Lucas's failure to abide by L.R. 56.1 should result, practically, in his forfeit of the case. ECF 35 at 3-6. His major crime was that, rather than attaching documents to his response to defendants' L.R. 56.1 statement, he attached them to his own L.R. 56.1 statement and then referenced that in his response. Soo Line asserts that this approach "force[d] [me] to puzzle through multiple filings to locate support and warrants disregarding [Lucas's] statements entirely." *Id.* at 4. Soo Line is correct that I am entitled to enforce strict compliance with Local Rule 56.1, but that is as far as its argument goes.

In the first place, Lucas's filings, inasmuch as they fail to abide by the letter of L.R. 56.1, shrink the number of documents I need to consult. And Lucas has done something I have rarely seen in his response to Soo Line's L.R. 56.1 statement, which is to simply admit obvious facts. In contrast, Soo Line's response to Lucas's statement starts each paragraph with a half-page or more or boilerplate objections before proceeding to admit or deny. This does not make for easy reading. And it is unnecessary when the paragraphs in question are simply quoting deposition testimony—*e.g.*, ¶¶ 2, 3—or making assertions that cannot reasonably be contested—in ¶ 11, Soo Line disputes that Lucas's testimony that he "contacted the mechanical foreman...[about] a safety issue" qualified as "reporting" a safety issue; in ¶ 13,

2

Administration and the Federal Railroad Safety Act ("FRSA"). Lucas worked for Soo Line first as a conductor and then as an engineer in the fourteen years leading up to 2023. Part of Lucas's job, in both positions, was to do regular safety checks of the trains he was operating and to report unsafe conditions to his superiors. Lucas was a union employee whose terms of employment, including disciplinary procedures, were governed by a collective bargaining agreement ("CBA"). Where union employees were accused of violating rules or policies, they could either engage in a 'waiver' process and acknowledge their wrongdoing or contest the accusation. If an employee contested an accusation, Soo Line would hold an investigatory hearing. A Soo Line executive would preside over the hearing, conduct examinations, and make the final determination as to whether the employee was 'guilty' or not. If an employee disagreed with that finding, he could then pursue arbitration through his union according to the terms of his CBA.

Lucas had a checkered disciplinary history with Soo Line, being cited some unclear but meaningful number of times over the decade and a half that he worked at the company. Lucas asserts

---

Soo Line disputes that a train derailment would be a "potentially serious safety concern." ECF 36 at 1–9. One might consider this kind of L.R. 56.1 response in violation of the spirit of the local rule. Regardless, I decline to grant summary judgment on this basis.

that some of his disciplinary accusations were warranted, and that in those cases he engaged in the waiver process and acknowledged responsibility. But he claims that the tenor of discipline at the company changed after 2014, when Soo Line adopted precision scheduled railroading ("PSR"). PSR is a methodology wherein a company can reduce staff and expenses, and thus increase profits, through the tightly-choreographed movement of freight, similar to just-in-time logistics.[2] After that transition, Lucas asserts that Soo Line began to discourage the kinds of safety reports he was supposed to make for his job—and his and his coworkers' safety—because they interfered with the tight timing requirements of PSR. Lucas nevertheless continued to make reports, which he claims led Soo Line to target him with unwarranted disciplinary complaints, and he asserts that he more regularly contested these complaints against him.

This all culminated in several safety reports and a spate of negative disciplinary decisions which resulted in Lucas's firing. In June 2016, Lucas reported to Soo Line that a hard-to-throw trainyard switch had injured his shoulder, resulting in him taking six months of medical leave. Sometime in 2022, Lucas reported that

---

[2] *See generally*, "FREIGHT RAIL: Information on Precision-Scheduled Railroading," GAO Report to Congressional Requesters (Dec. 2022), https://www.gao.gov/assets/gao-23-105420.pdf.

rock fill (called "ballast") in the Bensenville Freight Yard in Bensenville, Illinois, was too large to safely walk on and was causing other employees to be injured. On March 13, 2023, Lucas reported that a trainmaster—meaning Lucas's superior—named Kurt McKelvey drove unsafely in a rail yard while transporting Lucas and his crew to their train. And then on April 1, 2023, Lucas reported that McKelvey had ordered him to perform a brake test on his train improperly and had then ordered him to move the train despite not having properly tested the brakes.

In the year leading up to April 2023, Soo Line cited Lucas for rules violations four times. Each time he contested the violation; each time, following a hearing, Soo Line found him 'guilty' of the violation; and each time Lucas pursued arbitration. Under Lucas's CBA, a fifth violation within a twelve-month period could constitute grounds for dismissal, and in January 2023, Soo Line had Lucas sign a 'last-chance letter,' in which he acknowledged that further infractions could lead to his termination.

There then followed the day at the center of this case, April 14, 2023. Lucas reported for duty that morning and discovered that the 'cowcatcher' or plow on the front of his train had a jagged edge that, he believed, might have been more than six inches off the track. Regulations required the plow to be no higher, because

5

otherwise debris could get under the train and cause derailments or other problems. Lucas did not have a ruler on his person and could not locate the ruler that was printed in his rulebook, so he called his mechanical foreman, who told him to use a "reverser," a removable shifter for the locomotive which is about six inches long, to measure the plow's height off the track. The reverser fit underneath the plow, so Lucas told the mechanical foreman that he would have to come out to inspect the plow before Lucas could depart with the train.

The mechanical foreman eventually arrived and determined that the plow, though jagged, complied with regulations. This resulted in a delay in the departure of the train, which in turn resulted in an investigation by one of Lucas's superiors, Douglas Carl. During this investigation, Carl conducted a "download" of the relevant train's operating data and discovered that neither Lucas nor his conductor had conducted an air brake test before departing with their train.

Soo Line determined, and this is disputed, that Lucas's failure to carry a ruler with him on April 14 was a rules violation and set a violation hearing for April 18, 2023. At the conclusion of the hearing, the presiding officer, who was a Soo Line superintendent, found that Lucas's lack of a ruler had constituted a rule violation.

During the hearing, and without prior warning, Soo Line's hearing officer confronted Lucas with the fact that no-one had conducted a brake test on the locomotive on April 14. Lucas responded that he had forgotten to do one. As a result of that admission, Soo Line launched another disciplinary hearing, this time for the failure to test the brakes. That hearing took place on April 25, 2023. At that hearing, apparently with some help from his union representative, Lucas articulated a rationale under which he had not been required to perform a brake test. Soo Line once again found Lucas 'guilty' following the April 25 hearing.

On May 5, 2023, with the results of both hearings in hand, Soo Line's Senior Vice President Nicholas Walker fired Lucas. But there was one more wrinkle. Lucas's conductor, William Lenoir, was also a subject of the April 25 hearing, because engineers and conductors are both responsible for conducting brake tests before operating locomotives. Soo Line also found Lenoir 'guilty' following the April 25 hearing and disciplined him by assigning him demerits. But Lenoir filed a grievance with his union and, following a process opaque to the record, Soo Line scrubbed those demerits from Lenoir's file. And apparently, unlike Lucas, Lenoir had never filed a safety report before April 2023.

Lucas filed this suit following his termination, framing the above facts as depicting his years-long effort to maintain safety

standards at Soo Line, an effort which Soo Line opposed by disciplining him and, finally, firing him. His complaint sets out a single count in which he alleges he was fired in retaliation for his protected activities in violation of the FRSA. Soo Line has moved for summary judgment.

## II.

Summary judgment is appropriate where the record shows that "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The movant must identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact," and the non-movant must come forward with his own citations in opposition. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (citations omitted). I construe all facts in the light most favorable to the non-movant and draw all justifiable inferences in favor of that party. *Liberty Lobby,* 477 U.S. at 255.

### III.

The purpose of the Federal Rail Safety Act, 49 U.S.C. § 20101 *et seq.*, is to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." *Id.* § 20101. The FRSA prohibits rail carriers from, *inter alia*, retaliating against their employees' reports of safety issues, including workplace injuries, *id.* § 20109(a)(4), and hazardous conditions, *id.* § 20109(b)(1)(A). The FRSA adopts the burden-shifting framework applied to whistleblower suits under the Wendell H. Ford Aviation Investment and Reform Act (the "AIR Act"), 49 U.S.C. § 42121(b), whose "relevant burdens of proof are set forth in 29 C.F.R. § 1980.104(b)(1) and numerous court opinions." *Harp v. Charter Communications, Inc.*, 558 F.3d 722, 723 (7th Cir. 2009).

To make out a *prima facie* case of retaliation in response to a report of a workplace injury, an employee must show that: "(1) he made an injury complaint in good faith (i.e., engaged in a protected activity); (2) the rail carrier knew of the complaint; (3) he suffered an adverse employment action; and (4) the complaint was a contributing factor in the adverse action." *Armstrong v. BNSF Ry. Co.*, 880 F.3d 377, 381 (7th Cir. 2018). The *prima facie* case of retaliation for a report of a hazardous safety condition is nearly identical: "(1) [the plaintiff] engaged in protected activity, (2) the employer knew that he engaged in the protected

activity, (3) he suffered an unfavorable personnel action, and (4) the protected activity was a contributing factor in the unfavorable action." *Gutierrez v. Norfolk & S. Ry. Co.*, 2014 WL 551684, at *4 (N.D. Ill. Feb. 12, 2014) (citing *Harp*, 558 F.3d at 723) (cleaned up). Where a plaintiff has made out a *prima facie* case, the burden then shifts to the employer, who can "still escape liability if it can show, by clear and convincing evidence, that it would have taken the same [adverse employment] action absent the protected activity." *Armstrong*, 880 F.3d at 381.

Under these rubrics, the parties agree on only one point, which is that Lucas suffered an adverse employment action when Soo Line fired him. Soo Line contends, first, that Lucas failed to plead a workplace injury claim at all. And then it asserts that there is no dispute of fact that Lucas has failed to present evidence of any of the remaining three elements of a *prima facie* case of either a workplace injury or hazardous condition report retaliation claim. Lucas, for his part, contends that there is at least a dispute of fact as to each of the elements of each claim. And the parties have preliminary disagreements as to what, exactly, each of the elements of the *prima facie* case requires.

### A. Workplace Injury Claim

Soo Line asserts that Lucas failed to plead a workplace injury claim in the first place. Soo Line points out that in the body of

his complaint and its "Claim for Relief" section, Lucas cited only 42 U.S.C. § 20109(b)(1)(A) (having to do with hazardous conditions) and never cited 42 U.S.C. § 20109(a)(4) (having to do with workplace injuries). Soo Line is correct, but Lucas was obliged in his complaint to plead facts, not legal theories. *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 859 (7th Cir. 2017) ("The Federal Rules of Civil Procedure do not require a plaintiff to plead legal theories.") (citations omitted). "Accordingly, when a plaintiff does plead legal theories, it can later alter those theories," and, generally, "district courts should not hold plaintiffs to their earlier legal theories unless the changes unfairly harm the defendant or the case's development." *Id.*

Here, Soo Line is not harmed by Lucas asserting a claim for retaliation in response to the report of a workplace injury, because he pled facts regarding that injury in his complaint. "Lucas had a history of engaging in protected activity during his employment...On June 10, 2016, Lucas reported a work-related injury that he alleged was caused by a defective switch in the yard." ECF 1 at 3. And it is clear that Soo Line was on notice of those facts, given that its attorney examined Lucas about the shoulder injury during his deposition. *E.g.* ECF 31-2 at 82–83.[3]

---

[3] I note for the parties' convenience that this exhibit's cover page leads the ECF pagination to be one higher than the

11

## B. Engaging in Protected Activity in Good Faith

This element of the *prima facie* case is the one that differs between 42 U.S.C. §§ 20109(a)(4) and (b)(1)(A), but it does so only in the type of report. In the former, it must be that Lucas "notif[ied], or attempt[ed] to notify, the railroad carrier...of a work-related personal injury," while in the latter, Lucas must show that he "report[ed], in good faith, a hazardous safety or security condition."

There is at least a dispute of fact that Lucas notified Soo Line of a work-related personal injury in June 2016—I would say no dispute, but because Soo Line has framed this in its L.R. 56.1 statement as "Lucas *claims* that on June 10, 2016, he reported a shoulder injury to Soo Line," despite that Soo Line then granted Lucas six months' leave, it has left itself room to deny at trial that he actually made the report. ECF 31 at 13 (emphasis mine).

As to Lucas's alleged reports of hazardous conditions, I first have to resolve a preliminary question, which is whether this first element, variously phrased as 'engaging in protected activity' or reporting 'in good faith,' requires Lucas to present objective

---

transcript's internal pagination. That is, the 82-83 I cite here refers to the transcript's pages 81-82.

12

evidence of hazardous conditions or only evidence of his own subjective belief that such conditions obtained.

### 1. Objectivity and Good Faith

Soo Line maintains that for Lucas to make out this element as to each of the reports at issue, he must establish not only that he subjectively believed that a hazardous condition was present but also that an objective observer would have reached the same conclusion. Soo Line cites *Lillian v. Nat'l R.R. Passenger Corp.* for this proposition, and that case does state, in discussing the FRSA, that "[o]ur Court of Appeals has held that 'good faith,' as that concept was at issue in a different whistleblower statute, contains both a subjective and objective component." 259 F. Supp. 3d 837, 843 (N.D. Ill. 2017). The *Lillian* court was recognizing that a lot of borrowing goes on in cases involving whistleblower statutes, and it relied on *Lang v. Northwestern University* for its objectivity assertion. 472 F.3d 493 (7th Cir. 2006). *Lang*, written by Judge Easterbrook, dealt with whistleblower protections under the False Claims Act. *Id.* at 494–95. *Lang* did not devote much discussion to the subjectivity-objectivity question, instead citing summarily to *Neal v. Honeywell, Inc.*, 33 F.3d 860 (7th Cir. 1994).

*Neal* was also about whistleblower protection under the False Claims Act and was also written by Judge Easterbrook, and his

13

discussion of the issue leads me to believe that this line of cases has little to say about the FRSA:

> [Noting that the district court argued that there should be no objectivity element, relying on tests from other whistleblower statutes.]

> Yet there is no rule that all statutes addressing related topics mean the same thing—let alone that all statutes should receive the reading most favorable to whistleblowers. Why not treat all whistleblower laws as identical to the statute most favorable to employers, or treat all as if they were right in the middle? *Instead there is a longstanding principle that different language implies different meaning.*

*Id.* at 863 (emphasis mine). That is, the message sent by the *Neal* line of cases is not that all whistleblowers will have to establish that there was an objective ground for their reports, but rather that district courts should read the statutes in question to see what they require rather than blindly importing concepts from one law into another. *Id.*

For reports of workplace injuries, the FRSA prohibits retaliation against an "employee's lawful, good faith act done...to notify...the railroad carrier...of a work-related injury." 49 U.S.C. § 20109(a)(4). For reports of hazardous conditions, the FRSA prohibits retaliation against an employee for "reporting, in good faith, a hazardous safety or security condition." *Id.* § 20109(b)(1)(A). Both parties cite *Ziparo v. CSX Transportation*—Soo Line for a proposition it does not contain, which I will address later—a Second Circuit case which spoke to

14

this question. 15 F.4th 153, 158–59 (2d Cir. 2021). The *Ziparo* court noted that the plain meaning of an action taken in "good faith" is that it is one "performed 'with honesty or sincerity of intention,'" and that "[t]hat standard is on its face a subjective one, embracing only the actor's state of mind." *Id.* at 158 (quoting *In Good Faith*, Oxford English Dictionary (3d ed. 2014)).

The *Ziparo* court noted that other parts of Section 20109 employed additional language which *did* point to an objective test. For example, an employee reporting what he believes to be a violation of Federal law is only protected if he "*reasonably* believes" in the violation. 49 U.S. § 20109(a)(1) (emphasis mine). Likewise, an employee who refuses to work because of a hazardous condition is only protected if "a *reasonable* individual in the circumstances then confronting the employee would conclude" that the condition was hazardous. *Id.* § 20109(b)(2)(B) (emphasis mine). The court found that this "reasonable" language was meant to require an objective basis for a report, and it concluded that those parts of the statute which outlined a report "in good faith" without a "reasonable" qualifier were requiring only an employee's subjective belief. *Ziparo*, 15 F.4th at 158–59.

I find this analysis convincing, and it is clear to me, in line with the act's broad concern for safety, that the FRSA

15

requires Lucas only to establish his own subjective beliefs to make out a *prima facie* case.

## 2. The Various Reports

Having decided that initial issue, it is easy to find that the record supports, at the very least, a material dispute as to each report Lucas claims to have made.

Soo Line argues that Lucas can cite nothing outside of his own testimony to back up his belief that the ballast at the Bensenville Freight Yard was too large to be safe. But Lucas laid out a basis for his belief: the ballast was supposed to be smaller than three-quarters of an inch to be safely walked on, it was several times larger than that, and it had already injured other employees. ECF 31-2 at 89. Lucas likewise makes out that he sustained a shoulder injury in 2016 and that he believed that it happened on the job. *Id.* at 82.

The remaining three reports, about McKelvey's driving in the yard in March 2023, about McKelvey forcing Lucas to take out a train without properly testing its brakes, and about the cow catcher, require me to address another argument from Soo Line. Soo Line contends that none of these reports qualifies as protected activity. As to the former two, it urges that isolated incidents cannot constitute a "hazardous condition" under the FRSA, such that reporting McKelvey's driving or his order about the train

16

would not constitute protected activity. And as to the plow, Soo Line asserts that Lucas reported the cow catcher for some reason *other* than its effect on safety, meaning that that report was not protected activity either. ECF 30 at 8–10.

For its first proposition, Soo Line cited *Ziparo*, writing that in that case, the "Second Circuit distinguished between complaints about isolated behavior and complaints about patterns of unsafe conduct," and found that isolated behavior did not qualify as a hazardous condition. ECF 30 at 9. Because, according to Lucas, McKelvey only drove unsafely once, and only ordered him to take a train out unsafely once, those incidents did not constitute "hazardous conditions."

But *Ziparo* does not address the difference between "isolated behavior" and "patterns of unsafe conduct" at all. In the part of the opinion Soo Line cites for this argument, the *Ziparo* court was considering whether a hazardous condition had to be *physical* or if, in that instance, it could arise from an employee's mental health. 15 F.4th at 163–65. Its discussion has nothing to do with Soo Line's assertion. Soo Line's reading would be nonsensical in any case: in their formulation, the FRSA would allow an employer to retaliate against an employee who reported an 'isolated' train derailment or an 'isolated' chemical fire in the yard. Lucas reported that McKelvey was driving unsafely, which is a hazardous

17

condition, and he established that he believed it was hazardous. ECF 31-2 at 76. The same is true of McKelvey's order about the untested train. *Id.* at 71–72. That is enough.

For its second proposition, Soo Line contends that "Lucas asked questions and did not report a [hazardous] condition when he contacted Soo Line Mechanical Department about the plow." ECF 30 at 9. Soo Line backs up that contention with a quote from the transcript of Lucas's testimony at the April 18, 2023, disciplinary hearing, which I reproduce in full and without edits:

> The plow looked like it was jagging. And so I looked at it and thought it was a safety issue. I then climbed up on the locomotive. I told my Conductor that I thought the plow was wrong, and I called the Mechanical, and I told Mechanical that I could not find my ruler and I could not find in my rule book where was the ruler piece of paper. So I asked him what—what rule book it was because I couldn't remember which one had the ruler in it and if there was a way I could measure it because I stuck my flashlight up next to it and it was almost the whole flashlight off the rail.

*Id.* at 10. Soo Line seems to draw two things from this paragraph: (1) that Lucas himself never thought there was a safety issue, but only a regulation issue, with the plow; and (2) that whatever Lucas thought, he did not say the word "safety" or "hazardous" to his mechanical foreman, meaning that he did not report such a condition. Neither conclusion is compelling.

First, Lucas says in the quote provided that "I looked at it and thought it was a safety issue." *Id.* Second, the question

18

presented at that hearing had nothing to do with the FRSA, and nobody was asking Lucas about whether he had reported a hazardous condition. That Lucas did not spell it out in that testimony hardly forecloses the possibility that he said something like "I looked at it and thought it was a safety issue" to his mechanical foreman. And third, the statute requires Lucas to have reported a hazardous condition, not to state verbatim to whoever he's reporting it to: "I believe that the condition I am reporting is hazardous." Lucas has met his burden as to the plow.

### C. The Rail Carrier's Knowledge

### 1. Employer or Decisionmaker

Here again there is a preliminary question to answer. Soo Line asks that I find that to meet his burden under this element, Lucas must show that the particular decisionmaker who took the last step in his firing—in this instance, a vice president named Nicholas Walker—knew about his protected activity. Soo Line, in line with this theory, claims that Walker was not aware of any of Lucas's reports, not even the one about the plow height on April 14, 2023. ECF 31-13 at 4. Lucas, for his part, asserts that all he has to present is evidence that the rail carrier as a whole was aware of his various reports. While Lucas does not spell this out, my interpretation of his argument is that showing that an employee's managerial or supervisory staff in the aggregate was

19

aware of his activities would be to show that the rail carrier 'as a whole' was aware of them.

Lucas cites *Gilbert v. Union Pacific Railroad Company*, where the court wrote that the Seventh Circuit has held "that an FRSA retaliation plaintiff must show only that 'the *rail carrier* knew of the [plaintiff's] complaint.'" 2022 WL 1556101, at *6 (N.D. Ill. May 17, 2022) (quoting *Armstrong*, 800 F.3d at 381) (emphasis added in *Gilbert*). But as Soo Line points out, the knowledge question was not at issue in *Armstrong*, and the court wrote "the rail carrier knew of the complaint" in its section explaining the elements of the *prima facie* case without providing any accompanying analysis.

For its part, Soo Line cites *Gutierrez v. Norfolk and Southern Railway Company*, 2014 WL 551684, at *4 (N.D. Ill. Feb. 12, 2014). But the relevant quotation from that case is: "an employer cannot retaliate if it does not know of the complaint," which seems at best neutral and at worst like it supports Lucas's position. *Gutierrez* cites *Miller v. American Family Mutual Insurance Company*, which also refers to an "employer," which could also plausibly refer to either the individual decision-maker or the company as a whole. 203 F.3d 997, 1008 (7th Cir. 2000).

The text of the statute once again points the way. Section 20109(a) protects against retaliation by "[a] railroad carrier...a

20

contractor or a subcontractor of such a railroad carrier, or an officer or employee of such a railroad carrier," and Section 20109(b) prohibits the same by "[a] railroad carrier...or an officer or employee of such a railroad carrier." The plain language of these provisions suggests that a plaintiff could show knowledge on the part of a particular manager or on the part of the enterprise as a whole. Indeed, to find that the knowledge element is restricted to a particular decisionmaker would make the listing of the various entities whose knowledge the employee can prove, including the carriers themselves, superfluous. *Nielen-Thomas v. Concorde Investment Servs., LLC*, 914 F.3d 524, 528 (7th Cir. 2019) ("We must also, if possible, give effect to every clause and word of a statute, taking care not to read words into the text or to treat any words as surplusage.") (citations omitted).

Fair policy arguments could be made on either side. Finding that an employee need only prove knowledge on the part of the company as a whole, or of his supervisory staff as a whole, could result in a windfall for the employee. Someone who made a safety report Thursday but then said something obscene to their manager on Friday, for example, might reap a windfall when the area director, who had only heard about the obscenity, fired him.

But on the other hand, the whistleblower protections in the FRSA do not exist in a vacuum—they were not included in the

21

original act, and were only added when Congress learned, after its passage, that "railroad workers who complained about safety conditions were often retaliated against for their actions." *Koziara v. BNSF Ry. Co.*, 2015 WL 137272, at *5 (W.D. Wis. Jan. 9, 2015). Restricting the knowledge element to a single decisionmaker would allow railway carriers to limit their liability by distributing firing decisions among various managers, as the decision to fire Lucas was distributed among various managers.[4] Distributing decisionmaking like this would allow a manager who was aware of protected activity to recommend an employee be fired to a manager who had been insulated from that knowledge. The rail carrier could then point to that final decisionmaker's lack of knowledge as an impenetrable defense, even though the firing had in truth been motivated by the protected activity.

The burden-shifting framework under which these cases are resolved weighs in favor of reading the statute to require knowledge only on the part of the railway carrier. It allows the

---

[4] Walker's declaration asserts that he "was responsible for deciding employee discipline" in his territory, and that he made the final decision to fire Lucas. ECF 31-13 at 2-4. But in an interrogatory response, Soo Line stated that the decision to issue an initial disciplinary charge letter, at least, "is a collaborative process among management personnel." ECF 32-4 at 10. And it is clear that several managers were involved in the process after the charging letter stage. *Infra*, Section III.C.2.

22

party with less access to information—the employee—to meet the relatively minimal burden of showing that the company was aware. But then Soo Line's contention, that the individual decision-maker was not aware, falls neatly into its affirmative defense—Walker's ignorance could be powerful evidence that Soo Line would have fired Lucas whether or not he had made protected reports.

In light of the FRSA's overriding purpose—"to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents"—and its strong policy in favor of protecting reporting workers, I find that Lucas need only make out that the railway carrier as a whole, in the sense of his supervisory staff as a whole, was aware of his reports. 49 U.S.C. § 20101*.; cf. Conrad v. CSX Transp. Inc.*, 824 F.3d 103, 108 (4th Cir. 2016).

### 2. The Various Reports

Reading the facts in his favor shows that all but one of the reports were clearly within the knowledge of Lucas's superiors. Lucas reported his workplace injury in 2016 directly to Soo Line, and he did the same for McKelvey's driving and the cow catcher. His disagreement with McKelvey was in itself a report to a manager about a hazardous condition, and he later documented that disagreement on a company form. His report about the cow catcher

23

likewise went to a superior, his mechanical foreman, and came to the attention of several other members of management.

And I note that while Walker disclaimed knowledge of any of these reports, the "collaborative" firing process at Soo Line brought many more people than Walker into the decision. Superintendent Jacob Rinnels, who conducted the April 18, 2023, hearing made a recommendation as to Lucas. ECF 31 at 10. Superintendent Joshua Pennington, who presided over the April 27, 2023, hearing made a recommendation. ECF 31-23. Justin Dittrich-Bigley, Assistant Director of Labor Relations, made a recommendation. ECF 31-24. Al McCombs, another Assistant Director of Labor Relations, made a recommendation. ECF 31 at 10. John Kay, General Manager of Operations for the Eastern United States, made a recommendation. ECF 31-25. McKelvey and Carl both took reports directly from Lucas, and Carl was involved in both disciplinary hearings. ECF 31-15; ECF 31-20. The only reasonable inference that arises from having this many managers scrutinizing Lucas's record is that his various reports came to management's attention.

The closer issue is the ballast at the Bensenville Yard. Lucas testified that he reported the ballast issue in March 2023 not to Soo Line directly but to the Illinois State Commerce Commission. ECF 31-2 at 87–88. The Commerce Commission, under the Illinois Commercial Transportation Law, 625 ILCS 5/18c-1101 *et seq.*,

24

oversees and regulates rail carriers in Illinois, including safety conditions in railway yards.

Drawing all inferences in the light most favorable to Lucas, it is plausible, if not probable, that his report about the ballast made its way back from the Commerce Commission to his employer.

### D. Contributing Factor

The parties have one last preliminary dispute here. Soo Line contends that the parameters of the contributing factor element of the *prima facie* case come from a pair of cases from the Seventh Circuit: *Armstrong*, which I discussed above, and *Koziara v. BNSF Ry. Co.*, 840 F.3d 873 (7th Cir. 2016). Lucas argues that a more recent Supreme Court case, *Murray v. UBS Securities, LLC*, announced a new standard for evaluating this element. 601 U.S. 23 (2024). I am not convinced that these cases differ.

### 1. Retaliatory Motive

The appellant in *Armstrong* challenged a jury instruction about the contributing factor element on the ground that the instruction had required him to prove retaliatory intent, arguing that "he [was] not required to prove a retaliatory motive under the FRSA statutory scheme." 880 F.3d at 381. The court disagreed and explained that while "a plaintiff is not required to conclusively demonstrate that retaliation was the only—or even main—motivation" for his firing, "[a] showing of discriminatory

animus, which the statute requires, necessarily includes some proof of retaliatory motive." *Id.* at 382. But the court also noted that "the 'contributing factor' standard is lower than those applied in other anti-discrimination contexts," and that "[t]he analysis of whether the employer possessed an improper (i.e., retaliatory) motive is separate from the analysis of whether, and to what extent, that motive influenced the employer's actions." *Id. Koziara* supports the same premise: "[t]he [FRSA] does not punish railroads for disciplining (including firing) employees unless the discipline is retaliatory." 840 F.3d at 878.

*Murray*, which Lucas cites, was not an FRSA case; it concerned the Sarbanes-Oxley Act of 2002. But Lucas argues its logic is applicable here because Sarbanes-Oxley, like the FRSA, borrows the elements of its *prima facie* case and its burden-shifting framework from the AIR Act, 49 U.S.C. § 42121(b). The *Murray* Court noted:

> This framework is not unique to Sarbanes-Oxley and [the AIR Act]. It originated in the Whistleblower Protection Act of 1989...which provides legal protection for whistleblowers within the civil service. The framework was meant to relieve whistleblowing employees of the excessively heavy burden under then-existing law of showing that their protected activity was a significant, motivating, substantial, or predominant factor in the adverse personnel action, and it reflected a determination that whistleblowing should never be a factor that contributes in any way to an adverse personnel action. Congress then incorporated the easier-to-satisfy "contributing factor" framework into a series of similar whistleblower statutes that protect non-civil-service employees in industries where whistleblowing plays an especially important role in

26

> protecting the public welfare—including, as noted above, the airline industry ([the AIR Act]) and the securities industry (Sarbanes-Oxley).

601 U.S. at 28 (citations omitted).

The defendants in *Murray* maintained that because the Sarbanes-Oxley Act prohibited employers from discharging, suspending, threatening, harassing, "or in any other manner *discriminat[ing]* against an employee...*because of*" his whistleblowing activities, it required the showing of some retaliatory intent. *Murray*, 601 U.S. at 32–33 (emphasis mine). The Court concluded that the presence of the word "discriminate" in Sarbanes-Oxley did not mean that the employer had to have some "animus" or "prejudice" towards the employee in order to run afoul of the act, but only that it had to treat the employee differently than it would have if the employee had not engaged in protected activity. *Id.* at 34–35. The Court ultimately held that:

> While many statutes dealing with employment discrimination apply a higher bar, requiring the plaintiff to show that his protected activity was a motivating or substantial factor in the adverse action...the incorporation of the contributing-factor standard in Sarbanes-Oxley reflects a judgment that personnel actions against employees should quite simply not be based on protected whistleblowing activities—not even a little bit.

*Id.* at 36–37 (cleaned up).

There is nothing in the Court's decision that would preclude it from applying to the FRSA, which uses the word "discriminate"

27

in the same way as Sarbanes-Oxley.[5] The FRSA prohibits employers from "discriminat[ing] against an employee if such discrimination is due, in whole or in part," to the employee's reports of workplace injuries, and it prohibits "discriminat[ing] against an employee" for reporting "in good faith, a hazardous safety or security condition." 49 U.S.C. §§ 20109(a) & (b). This is the same kind of language that the *Murray* Court interpreted as requiring only disparate treatment, rather than "animus." 601 U.S. at 34–35. In fact, the Second Circuit, in making the decision the Supreme Court ultimately reversed, had specifically drawn on its FRSA caselaw to analyze the question under Sarbanes-Oxley and had determined that the relevant language in the statutes was functionally identical. *Murray v. UBS Securities, LLC*, 43 F.4th 254, 260 (2d Cir. 2022).

*Armstrong* uses two phrases that *Murray* rejects, "animus" and "retaliatory intent." *Armstrong*, 880 F.3d at 382. Despite that, I read the case itself as requiring basically the same showing as *Murray*. If the employee's protected activity played some role—though it could be "less than a substantial or motivating one"—in

---

[5] The Second Circuit found the same thing, once again in *Ziparo*, where it recognized that *Murray* had overruled past decisions requiring discriminatory animus in the FRSA context. *Ziparo*, 160 F.4th at 323.

the employer's calculus as it decided to discipline the employee, then that constitutes *Armstrong*'s "retaliatory animus" and means that the employee's protected activity was a "contributing factor" in their firing. 880 F.3d at 382 (citations omitted).

The apparent disagreement may arise from a lack of clear definitions. While *Murray* defined "discrimination," it did not describe exactly what "prejudice," "animus," or "retaliatory intent" would look like, although it did suggest that they might require showing that a plaintiff's "protected activity was a motivating or substantial factor in the adverse action." 601 U.S. at 36. Likewise, while *Armstrong* defined "retaliatory intent," it did not describe what it would look like for an employee's protected activity to have played a part in the employer's decision to fire *without* constituting "retaliatory intent." *Armstrong* and *Murray* disagree on the term to use, but they advance the same standard: employers cannot factor employees' protected activities into their firing decisions. *Armstrong*, 880 F.3d at 381–382; *Murray*, 601 U.S. at 32–37.

Stated another way, a "contributing factor" is "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Addis v. Dept. of Labor*, 575 F.3d 688, 691 (7th Cir. 2009). While perhaps semantically different, this is the same showing required by *Murray*: if the

29

employee's reporting played some role in the decision to fire him, even a little bit, then the employer has run afoul of the statute.

## 2. The Factor Contributed

Soo Line's approach to this element is to divide up Lucas's reports and to attack them one by one. Lucas has failed to produce any document or deposition where someone from Soo Line wrote or said that they fired Lucas because of his 2016 injury report, so I should grant summary judgment as to that report and narrow the scope of the evidence at trial accordingly. Lucas has failed to point to anyone who stated he was being fired for the Bensenville ballast, so I should grant judgment as to that report, and so on.

But this has Lucas's claim backwards. Lucas's contention is not that Walker or any other supervisor at Soo Line sat down and, pondering the report about the Bensenville ballast, decided that it was time for him to go. Rather, Lucas's claim is that Soo Line's transition to precision-scheduled railroading made it imperative for the company to keep trains on time at all costs. Under that regime, his tendency to be safety-conscious—of which these five reports are prominent examples—led him to become, in management's eyes, a troublesome employee. This built up to a run of what Lucas claims was unwarranted discipline in the year before spring 2023, and it culminated with his report about the plow on April 14, which

broke the camel's back and led to his firing, with Soo Line using the two disciplinary hearings as pretext.

In this frame, if Lucas can show that management was aware of his reports and show that Soo Line's stated reasons for his firing or the timing of his firing were fishy or shaky under scrutiny, then that combination of facts will give rise to the inference that his protected activity contributed, even in a small way, to management's decision to fire him. *Armstrong*, 880 F.3d at 381–82. Evidence which gives rise to the inference that the adverse action is connected to protected activity includes "temporal proximity, indications of pretext, inconsistent application of an employer's policies, an employer's shifting explanations for its actions...and a change in the employer's attitude toward the complainant after he or she engages in protected activity." *Cyrus v. Union Pacific Ry. Co.*, 2015 WL 5675073, at *11 (N.D. Ill. 2015).

The record before me, read in the light most favorable to Lucas, evinces several of those kinds of evidence.

Soo Line asserts that Lucas was disciplined in part for failing to report to work on April 14, 2023, with his required equipment, but the explanation behind his discipline has not exactly been static over time. Soo Line argues at points that the equipment in question was a ruler or tape measure, ECF 31 at 6, but Lucas's manager Carl testified at his deposition that he could

31

not recall there being any rule which required Lucas to have either, ECF 32-2 at 8-9. And as Lucas points out, his original charge letter concerned not missing equipment but instead a "[f]ailure to comply with instructions." ECF 31-16 at 2. Soo Line argues at other points that the equipment Lucas was missing was a rulebook with a ruler printed inside it, ECF 31 at 7, but Lucas's uncontested testimony is that he had the rule*book* but could not find the ruler *within* it and called his mechanical foreman to ask where inside the book the ruler was printed. *Id.* Soo Line points to the results of the disciplinary hearing on April 18, 2023, as proving that Lucas violated a rule, but as Lucas notes, that amounts to Soo Line asking that I take their word for it.

Also interesting, and in line with Lucas's overall theory of the case, is that the real through-line is neither a ruler nor a rulebook, but delay. Lucas's charge letter accused him of "delay[ing his] assignment." ECF 31-14. Likewise, the direct examination of Carl at the April 18 hearing by Soo Line focused not on a ruler or rulebook but rather on whether Lucas was *required* to check the plow. Carl's conclusion was that Lucas was not, and his decision to do so led to a delay when instead ignoring the plow would have been acceptable. ECF 31-15 at 28-30 (Carl: "...And delaying the assignment for an hour and 21 minutes due to the plow supposedly being out of date, or out of compliance, which as

32

indicated in [an exhibit] was in compliance with being measured with a tape measure by Mechanical."). These parts of the record create a dispute as to whether Lucas's over-care, rather than his lack of a ruler, was the real problem. And the record reflects that Lucas reported a safety issue, that he was disciplined immediately afterwards, and that there is a dispute of fact over whether that discipline was warranted by Soo Line's rules.

Next, there is the air brake test and the April 25, 2023, hearing. There is a dispute of fact over whether that test was required. ECF 31-2 at 55–63; ECF 32-2 at 14–16. And what followed that hearing gives rise to the inference that its results were flawed or pretextual. According to Soo Line's interpretation of its rules both here and at the April 24 hearing, Lucas *and* his conductor William Lenoir were responsible for conducting an air brake test, and both men were found 'guilty' at the hearing of a violation. ECF 35 at 13. Lucas was fired, while Lenoir received demerits. But Lenoir submitted a grievance under his union contract and Soo Line, in response, rescinded the discipline he had received. And as Soo Line noted in an interrogatory response, unlike Lucas, Lenoir had never filed a hazardous safety report before the April 14, 2023, incident. ECF 32-4 at 6.

Soo Line argues that this combination of facts somehow paints an innocent picture, ECF 35 at 13, but read in the light most

33

favorable to Lucas, it is the opposite. Two employees commit ostensibly the same infraction, but the one with a history of safety reports is punished more harshly. And then, despite the company's process finding both 'guilty,' the company, in negotiation with the non-safety-reporting employee's union representative, decides that in fact there was no reason to punish that employee. Soo Line may have had some innocent reason for expunging Lenoir's discipline, but it has not provided it, and as those facts stand, they give rise to the inference that the air brake discipline was pretextual.

And then there is the timing. Lucas testified that he reported the Bensenville Yard ballast issue in 2022, starting the year leading up to his firing in which he was regularly brought up on disciplinary charges. ECF 33 at 15–16. Then, shortly before his firing, he had two incidents with an immediate manager, Kirk McKelvey. First, he reported McKelvey for reckless driving in the yard on March 12, 2023. *Id.* at 16. Second, he reported McKelvey for ordering him to operate a train that had not been brake tested on April 1, 2023. *Id.* at 17. And then he reported the problem with the plow on April 14, 2023, and was terminated a few days later. There is no dispute, then, that Lucas's firing was at least temporally proximate to his reporting activity, which can give

34

rise to the inference that the two were related. *E.g. Cyrus*, 2015 WL 5675073, at *11.

Taking all this together, the only way that I could find that no "reasonable jury could return a verdict for the nonmoving party" on this element would be to resolve disputes of material fact against Lucas. *Anderson*, 477 U.S. at 248. As it is, if I read the record in the light most favorable to Lucas, the inference arises that, "alone or in connection with other factors," his protected activities "tend[ed] to affect in any way the outcome of" Soo Line's decision to fire him. *Addis*, 575 F.3d 691 (citations omitted).

### E. Affirmative Defense

Soo Line finally asserts that, even if I were to find that Lucas had made out a *prima facie* case, I should still grant it summary judgment, on the basis that it has proved by clear and convincing evidence that it would have fired Lucas even if he had not engaged in protected activity. It supports this argument by pointing to the 'last-chance' letter it had Lucas sign and the negative results of the two disciplinary hearings. But whether those hearings and results were pretextual *is* the dispute at the heart of this case. And in the same way that I cannot find that Lucas failed to make out a *prima facie* showing without resolving factual disputes against him, I cannot find that Soo Line has

35

conclusively made out its affirmative defense without doing the same, for the same factual disputes. And that means that whether Soo Line has carried its burden is a question for the jury. *Anderson*, 477 U.S. at 248.

**IV.**

Soo Line's motion for summary judgment is denied.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge
Dated: July 24, 2026
